# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| TIMOTHY UMBENHOWER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **No. 16-1298-JWL** |
| NANCY A. BERRYHILL,[1] | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Acting Commissioner of Social Security (hereinafter Commissioner) denying Disability Insurance benefits (DIB) and Supplemental Security Income (SSI) benefits under sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Social Security Act. 42 U.S.C. §§ 416(i), 423, 1381a, and 1382c(a)(3)(A) (hereinafter the Act). Finding no error in the Administrative Law Judge's (ALJ) decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING that decision.

## I.   Background

---

[1]On Jan. 20, 2017, Nancy A. Berryhill became Acting Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Ms. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant. In accordance with the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

This case comes before the court on Plaintiff's Complaint seeking judicial review of a decision of the Commissioner made after a previous remand by a court in this district. Umbenhower v. Colvin, Case No. 13-1398-SAC, slip op. (D. Kan. March 31, 2015) (R. 909-23). Plaintiff's Social Security Brief claims six errors in the ALJ's assessment of Plaintiff's residual functional capacity (RFC). He claims that the ALJ violated the court's order remanding this case, erroneously determined that ulnar neuropathy is not a medically determinable impairment in the circumstances of this case, failed to list PTSD (PostTraumatic Stress Disorder) as a severe impairment, stated that he included environmental limitations to accommodate Plaintiff's hearing loss but failed to demonstrate that the additional limitations accommodate the hearing loss, erred in his credibility determination in numerous respects, and erred in assessing limitations resulting from Plaintiff's mental impairments. (Pl. Br. 5-46).[2] Also before the court is Plaintiff's motion to remand pursuant to sentence six of 42 U.S.C. § 405(g).

The court's review is guided by the Act. Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009). Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be

_____

[2]By local rule, the court requires that "[t]he arguments and authorities section of briefs or memoranda must not exceed 30 pages absent a court order." D. Kan. R. 7.1(d). Plaintiff did not seek a court order allowing more space to address the alleged errors in the Commissioner's decision, yet his arguments total 41 pages in his Brief. Moreover, Plaintiff incorporated by reference into his arguments 8 pages of the court's Memorandum and Order which remanded the earlier case. (Pl. Br. 5).
Counsel is reminded to follow the local rules before this court in the future.

conclusive." 42 U.S.C. § 405(g). The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability. 20 C.F.R. §§ 404.1520, 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting

Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. §§ 404.1520(e), 416.920(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process--determining whether, in light of the RFC assessed, claimant can perform his past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, claimant is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.  At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

The court addresses each of Plaintiff arguments in the order presented and finds no error in the decision at issue and no basis under sentence six for remand in this case.

## II.    Violation of the Court's Remand Order

Plaintiff points out that the district court in the earlier case found error in the ALJ's failure in her RFC findings and in her hypothetical questioning of the vocational expert to adequately account for Plaintiff's deficits in concentration, persistence, and pace. He argues that the ALJ in this case repeated that error in the decision after remand and thereby violated the court's remand order. The Commissioner argues that the ALJ "reasonably complied with the Court's [sic] remand order," and subsequent case law clarifies how state agency consultants' opinions regarding mental capabilities are to be considered. (Comm'r Br. 5-6). She argues that not all limitations listed in Section I of the agency's Mental Residual Functional Capacity (MRFC) Assessment form must be listed in an ALJ's RFC assessment, but that Section III of the form explains the agency doctor's opinion and that an ALJ's MRFC assessment is sufficient if his decision explains how he accounted for the mental limitations opined. Id. at 7. In his Reply Brief Plaintiff argues that in the step three analysis the ALJ found Plaintiff has moderate limitations in social functioning and moderate difficulties with concentration, persistence, or pace as did the state agency psychologists whose opinions the ALJ accorded great weight. He argues that the limitations in the ALJ's mental RFC assessment are contrary to the moderate limitations found by him and the agency psychologists at step three and violate the court's remand order because the ALJ "did not address the Section I moderate limitations at all that he had been instructed to address." (Reply 4).

The court does not agree. In its remand order the court held that the ALJ's mental RFC assessment "that plaintiff [sic] can only perform simple, routine and repetitive tasks

fails to sufficiently relate, incorporate or accommodate the opinion[s]" of Dr. Bergmann-Harms and of Dr. Barnett and the ALJ's findings that Plaintiff has some difficulty in sustaining focus, attention, and concentration sufficiently long to complete tasks in a work setting.  (R. 920).  It therefore remanded the case "in order for the ALJ to include plaintiff's [sic] limitations in attention and concentration in her RFC findings and in the hypothetical question to the VE [(vocational expert)]," id., and "for further proceedings consistent with" the court's order.  (R. 923).

The ALJ did that.  In the first paragraph of his decision, he recognized that "[t]he District court remanded the case in order for the Administrative Law Judge to include the claimant's limitations in attention and concentration in the residual functional capacity findings and in the hypothetical question to the vocational expert."  (R. 772) (citing Ex. B12A/13 (R. 920)).  Whereas the former ALJ found that Plaintiff "has some difficulty in sustaining focus, attention and concentration sufficiently long enough to permit the timely and appropriate completion of tasks commonly found in work settings" (R. 17) (emphasis added), the ALJ whose decision is before this court found that "the evidence in the record shows that the claimant is capable of sustaining focus, attention and concentration sufficiently long enough to permit the timely and appropriate completion of simple, routine, repetitive tasks commonly found in work settings."  (R. 777) (emphasis added).

His mental RFC assessment also contained more depth and explanation:

Mentally, the claimant is able to understand, carry out and remember only simple, routine, repetitive tasks involving only simple, work related decisions, with few, if any, workplace changes.  The claimant should have

no interaction with the public. He can be around coworkers throughout the day, but with only brief, incidental interaction with those coworkers and no tandem job tasks that would require cooperation with another coworker. He is limited to work with no production rate or pace work, and work with no, or limited, work in close proximity to others to minimize distractions.

(R. 778).

With the exception of the last sentence quoted above, the mental limitations in the ALJ's second hypothetical at the hearing were identical in every material respect to the mental limitations in the RFC he assessed in the decision. (R. 832-33). Thereafter, the ALJ provided a final hypothetical to the VE in which he added to the second hypothetical limitations to "work with no production rate or pace work and work with no or limited work in close proximity to others in order to minimize distractions." (R. 834). In response to that hypothetical, the VE testified that such a hypothetical individual would be able to perform the three representative jobs upon which the ALJ relied to find a significant number of jobs in the economy that Plaintiff can perform. (R. 835-36); see also (R. 787) (cleaner/housekeeper, folding machine operator, routing clerk).

Finally, the ALJ provided a detailed explanation how he evaluated the state agency psychologists', and the psychological consultant's (Dr. Barnett's) opinions:

Although the claimant's alleged psychiatric symptoms are not entirely credible, I have considered his mental impairments in the residual functional capacity assessment. However, the record fails to show, by the preponderance of the evidence, that the claimant's mental impairments would cause disabling functional limitations. I have accommodated the claimant's moderate difficulties in social functioning by limiting the claimant to jobs that do not require any interaction with public, and involve only brief, incidental interaction with coworkers and no tandem job tasks that would require cooperation with another coworker. I have further

reduced the claimant's mental residual functional capacity, secondary to his moderate difficulties in concentration, persistence or pace, by finding that he is able to understand, remember and carry out only simple, routine, repetitive tasks involving only simple, work related decisions, with few, if any, workplace changes. Additionally, I have limited the claimant to work with no production rate or pace work, and work with no, or limited, work in close proximity to others to minimize distractions.

In making this finding, I have given great weight to the opinions of the State agency psychologists (Ex. B9A; B11A; B16F; Bl 7F; B25F; B26F). These opinions are supported by the findings and opinions of Dr. Barnett, which are given great weight as well (Ex. B10F). Dr. Barnett noted that the claimant had difficulty with both attention and concentration during the interview, but nevertheless appeared cognitively capable of simple, repetitive work tasks. As noted above, the various inconsistencies throughout the record, and the observations of the investigators during the cooperative disability investigation, cast serious doubt on the veracity of the claimant's subjective reports regarding his symptoms. These opinions are not inconsistent with the results of the prior neuropsychological examination (Ex. B4F). Per the District Court's order, I note that State psychologist's moderate restrictions in the "paragraph B" criteria are not the findings to which I give great weight, but rather I give more weight to the consultants' final analyses and opinions that the claimant has the capacity for simple, repetitive tasks with limited social contact. However, I have also added limitations to no production rate or pace work, and no, or limited, work in close proximity to others, in order to further minimize the claimant's exposure to potential distractions in the workplace. Likewise, I emphasize that these limitations in the residual functional capacity specifically reflect the manifestation of the claimant's "difficulty with both attention and concentration," as noted by Dr. Barnett.

(R. 784-85).

The ALJ did not violate the court's remand order. As noted above, the decision before this court is not the same as the prior decision in its assessment of mental limitations. Contrary to Plaintiff's argument, the mental RFC assessment in the decision at issue was far more specific, detailed, and nuanced than a limitation "to simple, routine,

repetitive and unskilled tasks." (Pl. Br. 7).  Moreover, Plaintiff's argument (that the

finding that Plaintiff is able be around coworkers throughout the day is inconsistent with

the finding that he must have no, or limited, work in close proximity to others in order to

minimize distraction) ignores the totality of the ALJ's finding that Plaintiff "can be

around coworkers throughout the clay, but with only brief, incidental interaction with

those coworkers and no tandem job tasks that would require cooperation with another

coworker.  He is limited to work with no production rate or pace work, and work with no,

or limited, work in close proximity to others to minimize distractions."  (R. 778)

(emphases added).

## III.    Ulnar Neuropathy

Plaintiff next argues that the ALJ erred in finding that ulnar neuropathy is not a

medically determinable impairment in the circumstances of this case.  (Pl. Br. 10-12).  He

points to the opinion of state agency medical consultant, Dr. Tawadros, that plaintiff is

limited to occasional feeling with his hands "possible [sic] due to ulnar neuropathy" (R.

453), and to her statement that mild bilateral ulnar neuropathy is a medically determinable

impairment "according to the NCT [(nerve conduction test)] in 3/06/07."  (R. 457).

Plaintiff cites to a statement made by another state agency medical consultant, Dr.

Siemsen, that "EMG [(electromyogram)] study prior file indicates mildly slowed ulnar

nerve conduction across elbows."  (R. 467).  Plaintiff also quotes from an ALJ decision

dated 18 September, 2009, "A nerve conduction study/EMG of claimant's upper

extremities was taken in March 2007.  The impression was of mild bilateral ulnar

neuropathy at the elbows without axonotmesis." (Pl. Br. 11) (quoting R. 85). Based upon this evidence, Plaintiff argues that the ALJ's statement that the record does not contain a specific diagnosis of ulnar neuropathy is "demonstrably false." Id. He concludes that the "failure to include ulnar neuropathy limitations in the RFC render [sic] the ALJ's determination without the support of substantial evidence." Id. at 12.

The Commissioner argues that the ALJ reasonably considered the evidence of ulnar neuropathy. She argues that the ALJ correctly found no objective evidence of ulnar neuropathy in the record. (Comm'r Br. 16). The Commissioner acknowledges Dr. Tawadros's finding that ulnar neuropathy is shown to be a medically determinable impairment according to the March 6, 2007 NCT. Id. at 16. But, she also points out Dr. Tawadros stated that the NCT evaluation on March 6, 2007 "did not indicate any evidence of neuropathy." Id. at 17 (quoting R. 457).

In his Reply Brief, Plaintiff argues that Dr. Tawadros's finding no evidence of neuropathy on March 6, 2007 was referring to neuropathy of the cervical spine, not of the ulnar nerve. (Reply 11). He argues that there was a difference of opinion between Dr. Siemsen and Dr. Tawadros regarding limitations in Plaintiff's hands, and that the Commissioner's reliance on an NCT of the cervical spine does not constitute sufficient evidence to prefer Dr. Siemsen's opinion over that of Dr. Tawadros. Id. at 11-12.

The resolution of this issue is much more straightforward than either party suggests. The ALJ found that "the record does not contain a specific diagnosis for ulnar neuropathy" (R. 775) (emphasis added) and he is correct. All of the evidence cited by

Plaintiff tends to suggest a diagnosis of ulnar neuropathy at some time in the past, but there is no record evidence containing a specific diagnosis during the period at issue here. Plaintiff appeals to an NCT from March 6, 2007 to show that ulnar neuropathy is a medically determinable impairment here, but that report is from a time outside the period at issue here and is not included in the administrative record.  Although Plaintiff argues based upon that report and implies error because "the agency did not included [sic] it in the present record" (Pl. Br. 11), he does not specifically argue such an error or seek to have the report included in the record.

Moreover, Plaintiff's quote from a prior decision dated September 18, 2009 is unavailing, because here the ALJ found that decision (which determined that Plaintiff was not disabled or entitled to DIB or SSI benefits through the date of that decision (R. 91)) is administratively final.  (R. 772).  He applied the principal of res judicata and determined the period at issue in this case began on September 19, 2009.  Id.  Plaintiff does not argue error in that determination or seek to reopen that decision.

It has long been the rule in the Tenth Circuit that the court may not consider evidence outside the administrative record in making its review of a Social Security Administration decision.  Ohler v. Sec'y of H.E.W., 593 F.2d 501, 505 (10th Cir. 1978). The case at issue illustrates one reason for that rule.  Evidence in this record suggests that the 2007 NCT found ulnar neuropathy to be a medically determinable impairment of Plaintiff at that time.  But, that evidence is, at best, equivocal.  The September 18, 2009 decision states that "mild bilateral ulnar neuropathy" was the "impression" given on the

March 2007 NCT report, but it does not reveal that such a <u>diagnosis</u> was made.  (R. 85).

It noted that the physician told Plaintiff that he should follow up if he noticed worsening,

but Plaintiff never followed up before the 2009 decision and there were "no further upper

extremity complaints for which a physician of record has suggested other form of

treatment, including surgical intervention."  <u>Id.</u>  It noted that Plaintiff later saw his

primary physician who reviewed the report of the NCT, and provided his own

"impression" of "cervical strain with radicular symptoms."  <u>Id.</u>  None of this constitutes a

diagnosis or requires finding that ulnar neuropathy is a medically determinable

impairment at the present time.

In his report in this case, Dr. Siemsen apparently had access to the NCT report and

noted, "EMG study prior file indicates mildly slow ulnar nerve conduction across

elbows."  (R. 467).  Once again, this statement does not contain a diagnosis of ulnar

neuropathy, and tends to confirm the equivocal nature of the prior record.  As Plaintiff

argues, Dr. Tawadros reviewed the report of the NCT and found Plaintiff's feeling ability

limited "possible [sic] due to ulnar neuropathy."  (R. 453).  Later, Dr. Tawadros provided

additional explanation of her opinion.  <u>Id.</u> at 457.  She found a medically determinable

impairment (MDI) of degenerative disc disease of the cervical spine according to an MRI

in December 2006.  <u>Id.</u>  She then stated that an "EMG & NCT evaluation in 03/06/07 did

not indicate any evidence of neuropathy."  <u>Id.</u>  In the very next sentence, Dr. Tawadros

stated, "MDI is established for mild bilateral ulnar neuropathy at the elbows according to

the NCT in 03/06/07."  <u>Id.</u>  To be sure Dr. Tawadros's report might be read to understand

the March 6, 2007 NCT as indicating <u>both</u> no neuropathy of the cervical spine <u>and</u> mild ulnar neuropathy, but it does not require that understanding. Again, this evidence does not require a finding that ulnar neuropathy is a medically determinable impairment during the period at issue in this case.

As noted, the 2009 decision and the medical consultants' reports refer to the report of the March 2007 NCT testing, but they are equivocal and do not definitively establish what is the substance of the report--which is not in the record. Therefore the ALJ did, and this court must, consider only the evidence which is in the administrative record in this case. The ALJ relied on an EMG in the record dated March 15, 2012 (Ex. B34F/39-41 (R. 688-91)) which showed no evidence of neuropathy or radiculopathy, and found that the record evidence "does not establish a medically determinable impairment [of] bilateral ulnar neuropathy." (R. 775). The ALJ also stated that he did "not adopt Dr. Tawadros's finding that the claimant can only occasionally feel with the hands, as the MRIs and EMG testing have not revealed any evidence of neuropathy or radiculopathy to support this limitation." (R. 783). All of Plaintiff's contrary assertions notwithstanding, the record evidence supports both of the ALJ's findings.

## IV.     PTSD and Hearing Loss

Plaintiff acknowledges that the ALJ found that his PTSD does not meet or medically equal Listing 12.06 for anxiety at step three, but argues error because the ALJ did not include PTSD as a "severe" impairment at step two, and "suggests" error because the ALJ did not specifically discuss PTSD in his RFC assessment. (Pl. Br. 11). He

acknowledges that the ALJ recognized Plaintiff's hearing loss and stated that he had accounted for that hearing loss by adding additional environmental limitations.  Id. at 12 (citing R. 780).  But, he argues that "the ALJ's 'additional environmental limitations' are not shown to accommodate this impairment."  Id.

The Commissioner points out that PTSD is an "anxiety related disorder" under Listing 12.06, and that both the ALJ and Dr. Wilkinson, the state agency psychological consultant upon whom the ALJ relied, considered PTSD in assessing RFC.  (Comm'r. Br. 15).  She points out that the ALJ also considered Plaintiff's hearing impairment, and argues that Plaintiff "has offered absolutely no support for his claim" that the environmental limitations assessed will not accommodate his hearing loss.  Id. at 16.

The ALJ's consideration of PTSD was adequate in this case.  As the Commissioner points out, PTSD is an anxiety-related disorder included within Listing 12.06 of the Listing of Impairments.  At step two, the ALJ found that "anxiety" is within the "severe" combination of impairments which Plaintiff has.  It is clear that PTSD was included in the ALJ's contemplation of anxiety because he specifically stated that Plaintiff "failed to demonstrate that his PTSD meets the 'paragraph C' criteria for Listing 12.06 [(anxiety-related disorders)]."  (R. 777).  When addressing his assessment of "the claimant's psychological impairments," the ALJ specifically noted that one of the diagnoses he included was the VA's diagnosis of PTSD.  (R. 784).  There can be no doubt that the ALJ had in mind Plaintiff's PTSD when making his RFC assessment between

steps three and four of his evaluation. More is not required. Plaintiff demonstrates no greater limitations caused by his PTSD than those assessed by the ALJ.

The court agrees with the Commissioner's argument that Plaintiff has not shown evidence of such hearing loss that it cannot be accommodated by the environmental limitations assessed by the ALJ. The ALJ pointed to a VA treatment note showing normal (the treatment note uses the term "fair" as Plaintiff points out) speech recognition scores and normal middle ear pressures. (R. 780) (citing Ex. B27F/22-23 (R. 511-12)). The ALJ also noted that hearing aids had been ordered for Plaintiff at the same appointment, and then he stated his finding that the environmental limitations assessed would accommodate Plaintiff's hearing loss. Id. As the Commissioner points out, Plaintiff presents neither evidence nor argument to refute that finding. The court finds no error in the ALJ's consideration of PTSD or hearing loss, particularly given the fact that Plaintiff has hearing aids.

## V.       Credibility Determination

In a wide-ranging argument, Plaintiff asserts numerous errors in the ALJ's credibility determination. (Pl. Br. 13-39). And, the Commissioner argues that the ALJ's evaluation of credibility rests on a permissible and reasonable consideration of the record evidence. (Comm'r Br. 17-20).

### A.       Standard for Evaluating Credibility

The framework for a proper credibility analysis is set out in Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987). An ALJ must consider (1) whether the claimant has

established a symptom-producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, the claimant's symptoms are in fact disabling. See, Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993) (explaining the Luna framework). The Commissioner has promulgated regulations suggesting relevant factors to be considered in evaluating credibility: Daily activities; location, duration, frequency, and intensity of symptoms; factors precipitating and aggravating symptoms; type, dosage, effectiveness, and side effects of medications taken to relieve symptoms; treatment for symptoms; measures plaintiff has taken to relieve symptoms; and other factors concerning limitations or restrictions resulting from symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The court has recognized a non-exhaustive list of factors which overlap and expand upon the factors promulgated by the Commissioner. Luna, 834 F.2d at 165-66. These factors include:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quoting Thompson, 987 F.2d at 1489).

The court's review of an ALJ's credibility determinations is particularly deferential. They are generally treated as binding on review. Talley v. Sullivan, 908 F.2d 585, 587 (10th Cir. 1990); Broadbent v. Harris, 698 F.2d 407, 413 (10th Cir. 1983). "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence. Wilson, 602 F.3d at 1144; accord Hackett, 395 F.3d at 1173.

**B.      The ALJ's Credibility Determination**

Here, the ALJ noted the regulations and rulings controlling the credibility determination and summarized their proper application. (R. 778-79). He stated his finding that Plaintiff's allegations of symptoms are not entirely credible and explained his reasons for making that finding. Id. at 779-82.

The ALJ found that Plaintiff's allegations are not supported by (1) the objective (medical) evidence; by Plaintiff's (2) minimal, conservative treatment for his physical impairments without pain management services; or by his (3) demonstrated ability to ambulate with a slow but steady gait without an assistive device, despite alleging he needs a cane. Id. 779-80. He found (4) multiple inconsistencies in Plaintiff's presentation at three consultative physical examinations performed by Dr. Cornett in April 2010, Dr. Henderson in December 2011, and Dr. Roberts in 2013. Id. 780-81. The ALJ found that Plaintiff had made (5) "purposeful attempts to exaggerate his symptoms, which may also explain the discrepancies between the consultative examinations." Id. at 781. He explained the bases for this finding were a Minnesota Multiphasic Personality

Inventory-2 (MMPI-2) administered by Dr. Barnett at a consultative psychological examination in February 2010, which suggested an invalid profile and possible symptom magnification, and a cooperative disability investigation (CDI) surveillance and report which demonstrated several inconsistencies between Plaintiff's reported symptoms and the investigation findings. (R. 781). Finally, the ALJ found that (6) Plaintiff's report of decreased activities of daily living is inconsistent with the minimal objective evidence demonstrating only mild changes in the cervical spine and no evidence of radiculopathy or neuropathy, with Plaintiff's report to the VA physical therapy staff that he is independent in his activities of daily living, and with his spouse's report of greater activities. Id. at 781-82.

### C. The Parties' Arguments

Plaintiff first objects to the finding that his allegations are not supported by the objective evidence. (Pl. Br. 13-17). He takes issue with the ALJ's characterization of certain of the MRI reports, arguing that the ALJ improperly stepped into the province of medicine and erroneously relied on his own medical opinion, and that the medical evidence, properly interpreted, shows more than minimal findings or only mild abnormalities. Id. at 13-14. He ignores the ALJ's finding that the EMG he cited does not show neuropathy, acknowledges that it does not show radiculopathy (characterized by Plaintiff as "neurological radiculopathy"), but argues "that does not rule out pain in the cervical spine and myofascial radiculopathy and pain." He implies error without directly making that argument, stating, "The ALJ did not mention myofascial pain syndrome even

though it was diagnosed and treated." Id. at 15. He then explains why, in his view, the EMG report does not discount Plaintiff's report of neck pain. Id. at 16-17. Plaintiff argues that the ALJ cited no medical opinion supporting his conclusion but merely relied upon his own medical opinion. (Pl. Br. 17).

Plaintiff attacks the ALJ's second reason, arguing that the ALJ stated no physician recommended surgery, without finding that surgery might have provided relief, and that he did not fulfill his basic duty of inquiry by asking Plaintiff why his treatment was sporadic. (Pl. Br. 17-18). He argues that the ALJ's finding that Plaintiff did not receive pain management services or other conservative form of pain relief is not true because Plaintiff entered into an opiate treatment agreement. He argues that he also tried a TENS unit and underwent trigger point injections on various occasions. Id. at 19-20.

With regard to the ALJ's fourth reason (inconsistent presentation at three consultative physical examinations) Plaintiff argues that the differences in grip strength and ability to perform orthopedic maneuvers are merely the normal fluctuation caused by pain. Id. at 20-21. He argues that the ALJ erroneously characterized his range of motion variously as "minimal," "hardly able to move," or "refused range of motion activities," and mischaracterized Dr. Henderson as questioning certain results obtained in his examination of Plaintiff. Id. at 21-22. He cites an online medical treatise for the proposition that doctors are to exercise great caution in finding that a patient with a painful syndrome is "faking it" when he exhibits "break-away" weakness on physical examination, and argues that nonetheless "this ALJ exercised none and instead

19

misrepresented Dr. Henderson's opinion to undermine Plaintiff's credibility." Id. at 22

(quoting Disorders of the Nervous System A Primer, Alexander G. Reeves, M.D., Rand

S. Swenson, M.D., Ph.D., (available online at https://www.dartmouth.edu/~dons/part_2/

chapter_12.html (last visited, August 1, 2017)). Plaintiff argues that although the ALJ

correctly reported that Dr. Henderson did not think the cane Plaintiff brought to his exam

was mandatory, the ALJ's failure to also include Dr. Henderson's statement that Plaintiff

uses the cane for pain management and balance constitutes the error of ignoring the

evidence as a whole and selectively abstracting pieces of the evidence favorable to his

position. (Pl. Br. 23) (citing, without pinpoint citation, Hawkins v. Heckler, 600 F. Supp.

832 (D. Kan. 1985), Claassen v. Heckler, 600 F. Supp. 1507 (D. Kan. 1985), and Green v.

Schweiker, 582 F. Supp. 786 (D. Kan. 1984)).

Plaintiff next attacks the ALJ's discussion of Plaintiff's "purposeful attempts to

exaggerate his symptoms," arguing that the ALJ therein mischaracterized the evidence

from the CDI, "did not dispute or apparently consider" the testimony of Plaintiff's wife at

the disability hearing in which she explained her view of the events when Plaintiff was

under surveillance, and "did not mention, reject, or even apparently consider Plaintiff's

explanation" why he maintained a commercial drivers license despite allegedly being

unable to drive commercially. Id. at 23-24. He argues that the ALJ's statement that the

CDI investigators noted Plaintiff's report on Facebook that he likes to garden and boat did

not properly quantify either or include Plaintiff's wife's explanation that the garden was

"a serenity area . . .built by others and maintained by his wife." Id. a 24. Plaintiff also

objects to the sixth reason given for discounting his credibility, arguing that the finding that Plaintiff's wife reports greater activities than Plaintiff reports is error because it implies greater activities than she actually reported.  (Pl. Br. 25).

Plaintiff next returns to Dr. Barnett's MMPI-2 test which the ALJ found to suggest symptom magnification and argues that although "Dr. Barnett could easily have diagnosed Malingering, if that were warranted," he did not, and he did not state that the MMPI-2 revealed "purposeful attempts to exaggerate," but rather that the scores "indicat[ed] generalized distress rather than specific psychopathology," and he did not say that he thought Plaintiff's symptom magnification was intentional.  (Pl. Br. 25-26) (apparently quoting Dr. Barnett's report without citation).

He argues that the ALJ should have considered the possibility that Plaintiff's psychological disorders combine with his physical problems to produce his pain.  He argues that the ALJ's consideration of the medical consultants' opinions is not sufficient to consider the possibility of psychological impairments combining with physical impairments because the medical consultants did not consider the psychological component of pain, and their medical opinions were formed before Plaintiff was even diagnosed with myofascial pain syndrome.  Id. at 26-27.

Plaintiff perceives that the ALJ in his summary and evaluation of the medical records and medical opinions relied on certain additional bases to discount the credibility of Plaintiff's allegations, and he explains how in his view those bases do not, or should not be used to discredit his allegations of symptoms.  Id. at 28-37.  Plaintiff argues that

the "ALJ failed to consider other credibility factors that supported Plaintiff's credibility," including a Functional Capacity Evaluation, the fact none of his doctors stated that he was exaggerating or malingering, and that he was trying to get back to work through education and treatment for his impairments. (Pl. Br. 37).

Finally, Plaintiff notes that the court may not "reweigh the evidence to shore up the credibility findings of the ALJ," or engage in post hoc rationalization to explain ambiguities in the evidence which were not resolved or explained by the ALJ. (Pl. Br. 38) (citing, respectively Kent v. Apfel, 75 F. Supp. 2d 1170, 1185 (D. Kan. 1999), and Meyers v. Colvin, No. 14-1349-JWL, 2016 WL 738199, at *4 (D. Kan. Feb. 23, 2016)).

The Commissioner points out that the ALJ provided numerous reasons for discounting Plaintiff's allegation of symptoms. (Comm'r Br. 17). She notes evidence supporting the ALJ's finding of inconsistencies in Plaintiff's allegations, and of conservative treatment. Id. at 17. She cites to record evidence supporting the ALJ's finding that Plaintiff was exaggerating his symptoms and argues that even if "there is another interpretation of [the] evidence, a reasonable person could believe that this evidence showed Plaintiff was exaggerating his symptoms for the purpose of receiving benefits." Id. at 19. She points out that under the regulations it is the ALJ's duty to consider the objective medical evidence, and that Dr. Siemsen's medical opinion supports the finding that ulnar neuropathy is not a medically determinable impairment and Plaintiff's "subjective complaints are in excess of objective findings." Id. at 19-20 (citing R. 466). She argues that when all of the evidence discussed and relied upon by the ALJ is

22

considered together it "amply supports the ALJ's decision to find that Plaintiff was exaggerating his symptoms." (Comm'r Br. 20). She argues that "[u]ltimately, Plaintiff is simply asking this court to reweight he [sic] evidence, to view it in a manner more favorable to him," but that is not permitted. Id.

In his Reply Brief, Plaintiff reiterates his view that the evidence requires finding error in the ALJ's credibility determination.

### D.    Analysis

Plaintiff's arguments fail to demonstrate error in the credibility determination at issue. Plaintiff's credibility arguments view the ALJ's statements in a hypertechnical manner and attribute mischaracterization, error, or improper animus, to the ALJ's summaries, findings, or statements which do not precisely fit Plaintiff's view of the evidence. "[C]ommon sense, not technical perfection, is [the] guide" for a court reviewing a Social Security disability decision. Keyes-Zachary v. Astrue, 695 F.3d 1156, 1167 (10th Cir. 2012); see also, Bowen v. Yuckert, 482 U.S. 137, 157 (1987) (O'CONNOR, J., concurring) ("Perfection in processing millions of [Social Security disability] claims annually is impossible."). Instead of attempting to demonstrate that the ALJ's reasons for discounting Plaintiff's allegations are not supported by the record evidence, Plaintiff argues that the ALJ's findings are in some way technically imperfect or otherwise "wrong."

For example, Plaintiff alleges error in the ALJ's characterization of MRI reports as revealing "minimal findings with only mild abnormalities  at C4-5 and C5-6," because

one of the MRI's showed a disc protrusion at C4-C5 with the <u>potential</u> for irritation of the nerve root, and the report instructed Plaintiff's physician to "correlate clinically." (Pl. Br. 13-14) (quoting R. 344) (capitalization omitted). He then complains that the ALJ misidentified another MRI (Ex. B34F/108-09) as Ex. B24F/108-09, and argues that although that MRI "had some minimal findings, it also showed more than the 'minimal findings' represented by the ALJ." (Pl. Br. 14) (purporting to quote the ALJ's decision). Contrary to Plaintiff's argument, the ALJ's summary of this MRI was a paraphrase of the "Impression" section of the MRI report--mild degenerative changes, mild to moderate bulge at C5-6, borderline central canal stenosis, and mild bulge at C6-7. (R. 779); <u>c.f.</u> (R. 758). Plaintiff bases his argument regarding this MRI on the report narrative which states results from each vertebral level of the cervical spine (of which the "Impression" is the report's summary) and thereby attempts to create an error where none exists. (Pl. Br. 14-15) (citing R. 757-58). Finally, Plaintiff acknowledges that the third MRI upon which the ALJ relied in assessing "minimal findings with only mild abnormalities at C4-5 and C5-6," shows "some interval decrease in the size of the right disc protrusion at C5-6, but was otherwise unchanged from the March 2012 study," as stated by the ALJ. (Pl. Br. 15) (quoting R. 779). He argues that the ALJ erred, however, because the MRI does not state the significance of the interval decrease in size, and because the ALJ did not mention the MRI also showed a "small disc osteophyte complex" at the C5-6 level with the disc protrusion superimposed. (Pl. Br. 15) (quoting R. 1571).

Plaintiff argues that by considering the MRIs at issue and assessing them as revealing "minimal findings with only mild abnormalities at C4-5 and C5-6," the ALJ erroneously relied on his own medical opinion and "overstepped his bounds into the province of medicine." (Pl. Br. 14) (quoting Miller v. Chater, 99 F.3d 972, 977 (10th Cir. 1996)). Miller is inapposite here because the ALJ in Miller made the inference that if Mr. Miller actually had the side effects he alleged, a physician would have prescribed a different medication regimen. The ALJ in Miller substituted his medical judgment for that of a physician, and that is error. Here however, the ALJ merely summarized the reports of three MRI's, and his summary is a fair representation of the reports. Moreover, although an ALJ is not an acceptable medical source qualified to render a medical opinion, "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004). "And the ALJ's RFC assessment is an administrative, rather than a medical determination." McDonald v. Astrue, 492 F. App'x 875, 885 (10th Cir. 2012) (citing Social Security Ruling (SSR) 96-05p, 1996 WL 374183, at *5 (July 1996)). Because RFC assessment is made based on "all of the evidence in the record, not only the medical evidence, [it is] well within the province of the ALJ." Dixon v. Apfel, No. 98-5167, 1999 WL 651389, at *2 (10th Cir. Aug. 26, 1999); 20 C.F.R. §§ 404.1545(a), 416.945(a). Moreover, the final responsibility for determining RFC rests with the Commissioner. 20 C.F.R. §§ 404.1527(e)(2), 404.1546, 416.927(e)(2), 416.946. The same can be said of an ALJ's

credibility determination--which is intertwined with the RFC assessment. Poppa v. Astrue, 569 F.3d 1167, 1171 (10th Cir. 2009).

Similarly, Plaintiff's argument ("[w]hile the EMG did not show neurological radiculopathy, that does not rule out pain in the cervical spine and myofascial radiculopathy and pain" (Pl. Br. 15)), is little more than a "red herring" in the circumstances. The ALJ did not "rule out pain in the cervical spine and myofascial . . . pain" as Plaintiff suggests. He acknowledged Plaintiff's allegations of neck and back pain and found at step two that Plaintiff has degenerative disc disease and pain disorder as two of his combination of severe impairments. (R. 775). In the very paragraph containing this discussion to which Plaintiff objects, the ALJ recognized that Plaintiff alleged "extreme pain in his neck" and "severe neck pain." (R. 779). And, the ALJ explained that he had assessed limitations due to Plaintiff's "degenerative changes in the cervical spine, . . . [and] degenerative disc disease of the cervical spine," and had accommodated Plaintiff's "allegations of chronic pain and headaches," but found that Plaintiff's "subjective complaints do not warrant any additional limitations beyond those established in the residual functional capacity previously outlined." (R. 782).

The point of the ALJ's discussion of the MRI and EMG reports is that Plaintiff's allegations are not supported by that objective evidence, and his point is well-taken. Plaintiff's attempted distinction between "neurological radiculopathy" and "myofascial radiculopathy" has no support in the record evidence, and, so far as the record reveals, "myofascial radiculopathy" is not a medical concept. Plaintiff cites no evidence in the

record and no authority, legal or medical, for the principle asserted, and the court was unable to find any. Moreover, assuming "myofascial radiculopathy" is a medical concept, the EMG upon which the ALJ relied and which Plaintiff attempts to distinguish did not distinguish between "neurological radiculopathy" and "myofascial radiculopathy," but stated its findings as "no significant peripheral neuropathy, . . . no <u>evidence</u> of radiculopathy L3-S1, . . . [and] no <u>evidence</u> of radiculopathy C5-T1." (R. 689) (capitalization omitted) (emphases added).

In his discussion of the credibility determination Plaintiff asserts, "The ALJ did not mention myofascial pain syndrome even though it was diagnosed and treated," and Plaintiff quotes and cites extensively from an online source regarding myofascial pain syndrome, citing numerous pages in the medical record where myofascial pain syndrome is mentioned, and includes a footnote citing medical evidence of muscle spasms, related treatment, and trigger point injections. (Pl. Br. 15-17, & n.2) (citing http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/ definition/con-20033195) (last viewed August 3, 2017). Plaintiff does not, however, argue error in failing to mention myofascial pain syndrome or point to prejudice from the failure. Thereby he has waived that argument. And, the court finds no reversible error because, as noted above, the ALJ found pain disorder to be a severe impairment and considered Plaintiff's allegations of pain in his spine and his shoulder, and headaches. While Plaintiff alleges the ALJ did not mention myofascial pain syndrome, he has not shown that the ALJ did not consider it.

The court has considered Plaintiff's remaining allegations of error in discounting Plaintiff's allegations of disabling symptoms, and finds them to be similarly flawed, viewing the ALJ's statements in a hypertechnical manner and attributing mischaracterization, error, or improper animus, to the ALJ's summaries, findings, or statements which do not precisely fit Plaintiff's view of the evidence. Viewed in this context and as seen in the examples discussed above, Plaintiff merely presents his view of the evidence and desires the court to reweigh the evidence more favorably to his position. The court may not do so. Bowman, 511 F.3d at 1272; accord, Hackett, 395 F.3d at 1172. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. [The court] may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Lax, 489 F.3d at 1084 (citations, quotations, and bracket omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

As noted above, the ALJ in this case considered the credibility of Plaintiff's allegations of symptoms, and provided six reasons for discounting them. (R. 779-82) see, supra pp.17-18. He then concluded his credibility determination:

> In summary, the claimant's allegations of disabling pain and physical limitations are out of proportion with the objective evidence. The credibility of the claimant's subjective allegations is further undermined by his minimal treatment, his inconsistent performance on consultative examinations and the results of the MMPI-2 test, which suggest possible symptom magnification. The observations and inconsistencies noted by the

> investigators during the cooperative disability investigation are further
> evidence that the claimant's symptoms are not as limiting as he alleges.

(R. 782). That ends his discussion of reasons for discounting Plaintiff's allegations of disabling symptoms. Nevertheless, Plaintiff makes additional, arguments of error in the credibility determination based on the ALJ's summary and evaluation of the medical records and medical opinions after his credibility determination. (Pl. Br. 27-37). To the extent that those allegations might reveal errors relating to the credibility of Plaintiff's allegations of symptoms, they cannot reveal prejudicial error in the ALJ's credibility determination because the ALJ did not rely upon them in his credibility determination.

Properly considering the decision at issue and giving the ALJ's credibility determination the deference it is due, the court finds no error.

## VI.    Mental Impairments

Plaintiff addresses the ALJ's alleged errors in evaluating Plaintiff's mental impairments in much the same manner in which he addressed the credibility determination. He argues based upon his view of the evidence, and primarily relies on the treatment records and opinions of Dr. Ohlde, Plaintiff's treating psychologist, and Dr. LaFrance, Plaintiff's treating psychiatrist. (Pl. Br. 39-45). The Commissioner views this argument as alleging error in the ALJ's weighing of the medical opinions of Dr. Ohlde and Dr. LaFrance. (Comm'r Br. 11-15). The court will follow the Commissioner's lead and address the alleged errors accordingly.

### A.    The ALJ's Evaluation of the Mental Health Providers' Medical Opinions

The starting point in judicial review of a Social Security decision is the decision itself.  With regard to the medical opinions related to mental healthcare, the ALJ accorded great weight to the opinions of the state agency psychologists and of Dr. Barnett who performed a psychological examination and provided a report of the examination.  (R. 785).  He found those opinions were mutually supportive and were consistent with a neuropsychological exam performed in July 2008.  Id.

The ALJ did not give significant weigh to Dr. Ohlde's psychological assessment because the tests she administered focus on Plaintiff's subjective reports, which the ALJ found incredible as discussed above.  He discounted her assessment because it did not address the possibility of symptom magnification–like Dr. Barnett's evaluation .  Id.

The ALJ noted that Dr. LaFrance provided a medical source statement that Plaintiff "has marked or extreme limitations in all areas of cognitive functioning."  Id.  He accorded this opinion little weight, discounting it because it is not supported by the medical evidence, is inconsistent with Plaintiff's reported abilities, group therapy notes do not reflect the extreme limitations in social functioning reported by Dr. LaFrance, and Plaintiff has never been hospitalized or required emergency mental health treatment.  (R. 785-86).  The ALJ noted that Dr. LaFrance later submitted a statement "describing the claimant's treatment and symptoms, and indicating that he is unable to successfully seek or sustain gainful employment."  (R. 786).  The ALJ accorded this opinion little weight because it is not consistent with the other psychological evidence, it does not provide

specific functional limitations, and it opines regarding the ultimate issue, disability, which is reserved to the Commissioner.  (R. 786).

### B.  Standard for Evaluating Medical Opinions

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources[3] that reflect judgments about the nature and severity of [a claimant's] impairment(s) including [claimant's] symptoms, diagnosis and prognosis." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  Such opinions may not be ignored and, unless a treating source opinion is given controlling weight, all medical opinions will be evaluated by the Commissioner in accordance with factors contained in the regulations. Id. §§ 404.1527(c), 416.927(c); SSR 96-5p, West's Soc. Sec. Reporting Serv., Rulings 123-24 (Supp. 2016).  A physician or psychologist who has treated a patient frequently over an extended period of time (a treating source) is expected to have greater insight into the patient's medical condition, and her opinion is generally entitled to "particular weight."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).  But, "the opinion of an examining physician [(a nontreating source)] who only saw the claimant once is not

---

[3]The regulations define three types of "acceptable medical sources:"

"Treating source:"  an "acceptable medical source" who has provided the claimant with medical treatment or evaluation in an ongoing treatment relationship.  20 C.F.R. §§ 404.1502, 416.902.
"Nontreating source:"  an "acceptable medical source" who has examined the claimant, but never had a treatment relationship.  Id.
"Nonexamining source:"  an "acceptable medical source" who has not examined the claimant, but provides a medical opinion.  Id.

entitled to the sort of deferential treatment accorded to a treating physician's opinion." Id. at 763 (citing Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995)).  However, opinions of nontreating sources are generally given more weight than the opinions of nonexamining sources who have merely reviewed the medical record.  Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004); Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir. 1987) (citing Broadbent, 698 F.2d at 412, Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982), and Wier ex rel. Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984)).

"If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) [(1)] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and [(2)] is not inconsistent with the other substantial evidence in [claimant's] case record, [the Commissioner] will give it controlling weight."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also, SSR 96-2p, West's Soc. Sec. Reporting Serv., Rulings 111-15 (Supp. 2016) ("Giving Controlling Weight to Treating Source Medical Opinions").

The Tenth Circuit has explained the nature of the inquiry regarding a treating source's medical opinion.  Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003) (citing SSR 96-2p).  The ALJ first determines "whether the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'"  Id. at 1300 (quoting SSR 96-2p).  If the opinion is well-supported, the ALJ must confirm that the opinion is also consistent with other substantial evidence in the record.  Id.  "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight."  Id.

If the treating source opinion is not given controlling weight, the inquiry does not end.  Id.  A treating source opinion is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  Id.  Those factors are:  (1) length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.  Id. at 1301; 20 C.F.R. §§ 404.1527(c)(2-6), 416.927(c)(2-6); see also Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001) (citing Goatcher v. Dep't of Health & Human Servs., 52 F.3d 288, 290 (10th Cir. 1995)).

 After considering the factors, the ALJ must give reasons in the decision for the weight he gives the opinion.  Id. 350 F.3d at 1301.  "Finally, if the ALJ rejects the opinion completely, he must then give 'specific, legitimate reasons' for doing so."  Id. (citing Miller, 99 F.3d at 976 (quoting Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987)).

## C.    Analysis

Once again, the tenor of Plaintiff's arguments is to argue that the ALJ reached the "wrong decision," not to point out why the ALJ's decision is unsupported by the record evidence.  He again argues based on technicalities and suggests conflict where none

33

exists. For example, Plaintiff begins with arguing that the ALJ's reliance on Dr. Barnett's conclusion that Plaintiff is "cognitively capable of simple, repetitive work tasks" (R. 785) is not the same as "saying [Plaintiff] was capable of simple, repetitive work," and therefore does not suggest the capability for work because Dr. Barnett also noted Plaintiff had difficulty with attention and concentration. (Pl. Br. 39) (emphasis in original). Plaintiff is correct that in his "Clinical Assessment Regarding Ability to Work," Dr. Barnett noted "difficulty with both attention and concentration during the interview and at times would lose the thread of the conversation." (R. 418). But, in the very next sentence, Dr. Barnett concluded that Plaintiff "appears cognitively capable of simple, repetitive work tasks, but would probably have difficulty with complex tasks." Id. (emphasis added). A reasonable interpretation of this, in context, is that when working Plaintiff would have difficulty performing complex tasks, but is capable of simple, repetitive tasks. That is the interpretation the ALJ made, and he is not required to accept Plaintiff's view, even if the record might support conflicting interpretations. The court quoted the ALJ's explanation regarding his evaluation of Dr. Barnett's report, supra at 7-8, and in context, it is a reasonable evaluation, supported by the record evidence.

Plaintiff objects to the ALJ's determination to discount Dr. Ohlde's opinion in part because the tests she administered all focus on Plaintiff's subject reports of symptoms which had been found not credible. She argues this is error because "Dr. Ohlde referred to the 'objective nature of the Rorschach.'" (Pl. Br. 40) (quoting Dr. Ohlde without citation). Plaintiff's quote from Dr. Ohlde is taken out of context and does not support

the inference Plaintiff suggests--that the Rorschach test does not focus on subjective responses. In the first paragraph of her report of Plaintiff's "Group/Individual Personality Assessment," Dr. Ohlde provided some general observations of Plaintiff and the general scope, tenor, and validity of the assessment. (R. 646). In those observations, she noted, "The Rorschach was taken in an overly objective manner, limiting the data to some degree." Id. This seems to indicate that Plaintiff took the Rorschach test in an overly objective manner, and tends to confirm the ALJ's finding that the tests administered by Dr. Ohlde focus on Plaintiff's subjective reports. The take-away from this seems to be that Plaintiff tried to address this particular test more objectively than expected, and thereby limited its value as a diagnostic tool. Later in her report, Dr. Ohlde stated, "Mr. Umbenhower's thinking is at least confused, but the overly objective nature of the Rorschach prevents full evaluation." (R. 648). Still later in the report, she noted, "Cognitive fragmentation is likely, but the data is tentative. A more severe disorder cannot be ruled out, given the objective nature of the Rorschach." Id. It is clear from the report, considered in context, that the Rorschach test is a subjective test as the ALJ found, but that Plaintiff took the test in an overly objective manner and thereby skewed the proper interpretation. Plaintiff's argument manufactures an error where none exists.

Plaintiff then provides a quotation from Dr. Ohlde's report, arguing that Dr. Ohlde described Plaintiff's functioning in detail. (Pl. Br. 41-43). Again, it appears that Plaintiff would rather the court reweigh the evidence and substitute a more favorable judgment of the weight to be given the opinion. As noted above, it may not.

Plaintiff next argues that the ALJ erred in weighing Dr. LaFrance's opinion because he did not follow the regulatory requirements in weighing the opinion. Id. at 43 (citing 20 C.F.R. §§ 404.1527(d)(1)-(6), 416.927(d)(1)-(6)).[4]  He asserts that the ALJ

> failed to note the length of the relationship, which was from February 2012. R. 1741.  He did not consider [Dr. LaFrance's] specialty, which was psychiatry.  He accepted the opinion of an examining physician and even those of reviewing physicians over that of [Dr.] LaFrance.

Id.  There is no error here.  The court will not insist on a factor-by-factor analysis of credibility so long as the "ALJ's decision [is] 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007) (quoting Watkins, 350 F.3d at 1300).  While the ALJ did not state that Dr. LaFrance had treated Plaintiff since 2012, Plaintiff acknowledges the ALJ's statement that she had "a 'substantial treating relationship' with Plaintiff." (Pl. Br. 43).  By stating that Dr. LaFrance is Plaintiff's psychiatrist, the ALJ clearly indicated that he had considered her specialty of psychiatry.  (R. 785).  Moreover, that a treating source opinion is entitled to greater weight than that of a non-treating source or of a non-examining source is only the general rule, and the ALJ in this case stated his reasons for discounting the treating source opinions and for according greater weight to the other psychologists. Those reasons are supported by the record evidence, and more is not required.

---

[4]Plaintiff cites to a portion of the regulation which was moved in 2012.  The proper citation is 20 C.F.R. §§ 404.1527(**c**)(1-6), 416.927(**c**)(1-6).

As the ALJ suggested, Dr. LaFrance opined that Plaintiff has extreme limitations ("no useful ability to function in this area") in all areas except the ability to carry out short, simple instructions, and in that area she found a marked limitation ("ability to function is severely limited, but not precluded"). (R. 1447-48). These severe limitations are clearly not supported by the record evidence. And, as the ALJ noted, were Plaintiff's limitations such as Dr. LaFrance opined, one would expect a much more intense (and less social) treatment regimen than group therapy or aquatic therapy sessions. (R. 785-86).

## VI.   The Cooperative Disability Investigation (CDI)

Lurking over the decision at issue is the results of the CDI. Plaintiff has attempted to overcome the effects of its findings, to no avail. As the ALJ noted, when those results are considered in light of Dr. Barnett's finding of possible magnification of complaints, there is ample evidence to discount Plaintiff's allegations of symptoms and to hold suspect Plaintiff's reports to his treatment providers. In his Reply Brief, Plaintiff objects to the "ALJ–on his own initiative" requesting the CDI (Reply 19), and argues that there is a due process issue because the ALJ is supposed to provide a fair hearing, but became suspicious and ordered an investigation, and was therefore unable to act as an impartial judge when adjudicating the claim. Id. at 20. He argues "that, in this case and this situation, the dual role of the ALJ as both active whistle blower/fraud investigator and adjudicator has wrapped the ALJ with significant authority and gone too far." (Reply 22).

There is a problem with Plaintiff's assertion of a constitutional issue for the first time in his Reply Brief. The problem is that he has left the government without the

opportunity to respond to the allegations.  See, e.g., M.D. Mark, Inc. v. Kerr–McGee Corp., 565 F.3d 753, 768 n. 7 (10th Cir. 2009) ("[T]he general rule in this circuit is that a party waives issues any arguments raised for the first time in a reply brief.").

Moreover, Plaintiff's argument is without merit because it fails of its premise, that the ALJ in this case was "both active whistle blower/fraud investigator and adjudicator." The CDI was performed and the report prepared on January 4, 2012.  (R. 622).  The report states that the Office of Disability Adjudication and Review (ODAR) in Topeka, Kansas had requested the investigation.  Id. at 623.  The report was done and in the record in front of the prior ALJ when she made her decision dated August 1, 2012.  (R. 12-27). If an ALJ performed both roles as investigator and adjudicator, it was ALJ Mein, who held the July 23, 2012 hearing and issued the August 1, 2012 decision in that case.  (R. 27, 69).  That decision was appealed to the District Court, and was remanded for further proceedings.  (R. 908-23, 926).  On remand, it was ALJ Steuve who presided over this case.  (R. 772-88, 800).  There is simply no evidence that ALJ Steuve was operating as both an investigator and an adjudicator.

The court finds no error in the decision at issue.

## VII.    Motion for Sentence Six Remand

On May 3, 2017, Plaintiff made a motion for remand of this case pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of new and material evidence.  (Doc. 23).  The evidence Plaintiff seeks to have included in the record is an opinion statement signed by Dr. LaFrance on September 14, 2015.  (Doc. 25, Attach. 2).  In the statement,

Dr. Lafrance opined that Plaintiff's impairments have been as limiting as she described in her earlier opinions at least since October 19, 2011, opined that Plaintiff's presentation at the VA is "not the profile of a malingerer," and explained her bases for that opinion. Id.

Plaintiff argues that the evidence is new and material within the meaning of the Act "because it addressed credibility issues that [are] central to the ALJ's decision." (Doc. 24, p. 3) (hereinafter Sent. 6 Mem.). He also argues that there is good cause for the failure to include the evidence in the record before the Commissioner. Id.

The Commissioner admits that the evidence is new and that there is good cause for the failure to include the evidence in the record before the Commissioner. (Comm'r Br. 20-21). She argues, however, that the evidence is not material because it would not change the ALJ's decision if it had been considered by him. Id. This is so, in her view, because the the ALJ twice rejected other opinions from Dr. LaFrance because they are inconsistent with the record, because Dr. LaFrance did not recognize or address the record evidence of Plaintiff's purposeful exaggeration of symptoms, and because the issue of credibility is reserved to the Commissioner. Id.

In accordance with the sixth sentence of 42 U.S.C. § 405(g), the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Because the Commissioner admits that the evidence at issue is new and that there is good cause for the failure to include it in the record, the only issue to be

determined by the court is whether the evidence is material. "Evidence is material if 'the [Commissioner's] decision might reasonably have been different had the [new] evidence been before him when his decision was rendered.' " Wilson, 602 F.3d at 1148 (quoting Cagle v. Califano, 638 F.2d 219, 221 (10th Cir. 1981)).

There is no reasonable probability that the decision would have been different had Dr. LaFrance's latest opinion been before the ALJ below. As discussed above, the ALJ discounted Dr. LaFrance's opinions because they are not supported by the medical evidence or the other psychological evidence, are inconsistent with Plaintiff's reported abilities, because group therapy notes do not reflect the extreme limitations in social functioning reported by Dr. LaFrance, because they do not provide specific functional limitations, and opine regarding issues reserved to the Commissioner. (R. 785-86). None of this will be affected by Dr. LaFrance's new statement. The new opinion remains unsupported by the medical evidence and inconsistent with the psychological evidence. Including the new statement, the opinions remain inconsistent with Plaintiff's reported abilities, and with the ability to engage in group therapy. The new opinion does not provide specific functional limits and opines on another issue reserved to the Commissioner. The new opinion cannot be found to contradict or rebut the key findings of the ALJ merely because it reiterates and provides new reasons to support Dr. LaFrance's opinion that Plaintiff is disabled and is not malingering.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

40

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Remand pursuant to sentence six (Doc. 23) is DENIED.

Dated this 14th  day of August 2017, at Kansas City, Kansas.

s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**